# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ARISTOCRAT TECHNOLOGIES, INC., *et. al.*, | Case No.: 2:24-cv-00382-GMN-MDC |
| Plaintiffs, | **ORDER GRANTING PRELIMINARY INJUNCTION** |
| vs. | |
| LIGHT & WONDER, INC., *et. al.*, | |
| Defendants. | |

Pending before the Court is the Motion for Preliminary Injunction, (ECF Nos. 52, 53-1), filed by Plaintiffs Aristocrat Technologies, Inc. and Aristocrat Technologies Australia Pty Ltd., (collectively, "Aristocrat"). Defendants Light & Wonder, Inc., LNW Gaming, Inc., and SciPlay Corporation, (collectively, "L&W"), filed a Response, (ECF Nos. 77, 79), to which Plaintiffs filed a Reply, (ECF Nos. 90, 93-1). The Court granted Plaintiffs' Motion for Leave to Supplement, (ECF Nos. 80, 82-1), to which Defendants filed a Sur-Reply, (ECF No. 106, 108). A hearing was held on September 9, 2024, and both parties addressed the Court.

Because Aristocrat has demonstrated that all *Winter* elements are met, the Court **GRANTS** Aristocrat's Motion for Preliminary Injunction.

## I.    BACKGROUND

Aristocrat and L&W are competitors in the electronic video slot machine space, and this case arises out of actions allegedly taken by L&W to copy the underlying mathematical formulas of Aristocrat's Dragon Link game in L&W's newer Dragon Train game. (*See generally* Mot. Prelim. Inj., ECF Nos. 52, 53-1). Aristocrat's expert, Mr. Vancura, explains that both video slot machine games include a base game of five spinning reels, each of which displays symbols in a single column. (Vancura Decl. ¶¶ 14–15, App. I to Mot. Prelim. Inj, ECF

Nos. 52-1, 53-4).  The games also contain a Major Jackpot, a Grand Jackpot, and two bonus features: free games and a Hold & Spin feature. (*Id.* ¶ 31).  The Hold & Spin feature is triggered when a player receives six or more SCAT2 symbols[1], which are depicted as a gold orb. (*Id.*).  Each orb is held in place for three spins, and any additional orbs collected during the three spins will also be held in place. (*Id.*).  Every time a player lands a new orb, it resets the free spin number back to three. (*Id.* ¶ 34).

Aristocrat released its Lightning Link game in 2014, which led to the launch of their follow-up game, Dragon Link, in 2016. (Deitz Decl. ¶ 14, App. I to Mot. Prelim. Inj., ECF Nos. 52-1, 53-3).  Dragon Link includes ten Asian-themed titles. (*Id.*).  According to Aristocrat's experts, these games are "exceptionally complex and contributed to a longer-than-usual development time," (*id.* ¶ 16), but the hard work paid off because Lightning Link and Dragon Link have continued to outperform industry averages. (*Id.* ¶ 19); (Vancura Decl. ¶ 27, App. I to Mot. Prelim. Inj.).  Aristocrat explains that its success is due to the complex mathematical design of the games, which it considers a valuable trade secret. (Vancura Decl. ¶ 47, App. I to Mot. Prelim. Inj.).

At the core of this suit is Aristocrat's belief that L&W's Dragon Train was developed using Dragon Link game math that it acquired through the hiring of Ms. Emma Charles.  Ms. Charles worked for Aristocrat from 2008 to July 2017, during which time she was part of the team that developed Dragon Link. (Charles Decl. ¶ 3, Ex. 1 to Resp., ECF Nos. 77-1, 79-1).  In July 2021, she joined Scientific Games, which later became L&W, as a senior mathematician working in casino game design. (*Id.*).  Ms. Charles first began working on Dragon Train in late 2021, and eventually led the overall direction for all Dragon Train games. (*Id.* ¶ 4).  The Dragon Train team also included Wil Soo and Yuri Leontiev, who have never been employed

---

[1] "SCAT2 symbols" refers to gold coin-like orbs which can appear scattered among and in place of the usual symbols which appear for the player on the spinning reels when the reels stop spinning.

1   by Aristocrat. (Leontiv Decl. ¶¶ 3–4, Ex. 8 to Resp., ECF Nos. 77-9, 79-8); (Soo Decl. ¶ 4, Ex.

2   7 to Resp., ECF Nos. 77-9, 79-7).  Ms. Charles had knowledge of Dragon Link's game math,

3   but she was subject to a confidentiality agreement in her Aristocrat employment contract.

4   (Primmer Decl. ¶ 21, App. I to Mot. Prelim. Inj., ECF Nos. 52-1, 53-2); (Charles Contract, Ex.

5   B to App. 1 to Mot. Prelim. Inj., ECF Nos. 52-1, 53-2).

6        When L&W's Dragon Train game launched in Australia in 2023, an Aristocrat game

7   developer played the game and immediately noted how similar Dragon Train felt to Dragon

8   Link. (Deitz Decl. ¶ 99, App. I to Mot. Prelim. Inj.).  Even though he couldn't see the

9   underlying game math, he noticed similar public-facing elements such as (1) five reels with

10  three visible symbols, (2) the same symbol set, (3) identical payout amounts and win

11  conditions, except for the 4 scatter symbols that pay 15 in Dragon Link but pay 10 in Dragon

12  Train, (4) the same jackpots and trigger rules for the Major and Grand jackpots, (5) a Hold &

13  Spin triggered by six or more bonus symbols that gives three free spins, and (6) a Free Game

14  feature triggered by three or more scatter symbols. (*Id.*).  Based on the similarities between the

15  games, Aristocrat alleges that L&W has improperly obtained and used Aristocrat's confidential

16  Dragon Link mathematical information in its creation of Dragon Train. (Mot. Prelim. Inj. 7:13–

17  15).  The Court heard oral argument on the motion on September 9, 2024.

18  **II.    LEGAL STANDARD**

19        "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed

20  on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief,

21  that the balance of equities tips in his favor, and that an injunction is in the public interest."

22  *Winter v. NRDC, Inc.*, 555 U.S. 7, 20, (2008).  Injunctive relief is "an extraordinary remedy that

23  may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22.

24  "[C]ourts must balance the competing claims of injury and must consider the effect on each

25

party of the granting or withholding of the requested relief." *Id.* at 24 (internal quotation marks omitted).  The Ninth Circuit has additionally held that "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) (internal quotation marks omitted).

## III.   __DISCUSSION__

Aristocrat's instant Motion for Preliminary Injunction is based on its claim for trade secret misappropriation. (Mot. Prelim. Inj. 12:9–11).  The Court begins its analysis with whether Aristocrat has shown a likelihood of success on the merits of its trade secret misappropriation claim.

### A. Likelihood of Success on the Merits

To demonstrate a likelihood of success on the merits, Aristocrat must show "a fair chance of success" on its claim that L&W used or disclosed its trade secrets in contravention of a "duty not to disclose." *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (en banc); *Indep. Techs., LLC v. Otodata Wireless Network, Inc.*, 836 F. App'x 531, 533 (9th Cir. 2020).  Aristocrat brings its Trade Secret Misappropriation claims under the federal Defend Trade Secrets Act ("DTSA") and the Nevada Trade Secrets Act ("NTSA").  "To succeed on a claim for misappropriation of trade secrets under the DTSA, a plaintiff must prove: (1) that the plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020); *see* 18 U.S.C. § 1839(5).  The NTSA requires similar elements: (1) a valuable trade secret, (2) misappropriation, and (3) breach of a contract or misappropriation by a party with a duty not to disclose. *Frantz v. Johnson*, 999 P.2d 351, 358 (Nev. 2000).

1

### 1.  Existence of a Valuable Trade Secret

2

To prove ownership of a trade secret, plaintiffs "must identify the trade secrets and carry

3

the burden of showing they exist." *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 522

4

(9th Cir. 1993).  "The plaintiff 'should describe the subject matter of the trade secret with

5

sufficient particularity to separate it from of general knowledge in the trade or of special

6

knowledge of those persons . . . skilled in the trade.'" *Imax Corp. v. Cinema Techs., Inc.*, 152

7

F.3d 1161, 1164 (9th Cir. 1998).  A trade secret is information that derives value from being

8

kept secret and is not "readily ascertainable through proper means." *InteliClear, LLC*, 978 F.3d

9

at 657; NRS §§ 600A.030, 600A.010(5)(a); 18 U.S.C. §§ 1839(3), (5).[2]  Whether information is

10

a trade secret is a question of fact for the factfinder. *Frantz*, 999 P.2d at 358.  Relevant factors

11

to consider include the extent to which others outside the business know of the information, the

12

ease or difficulty with which others could acquire the information properly, whether the

13

information was confidential or secret, and the measures the plaintiff took to guard the

14

information's secrecy. *Id.* at 358–59.

15

L&W's first argument is that Aristocrat has not sufficiently described its trade secrets.

16

(Resp. 12:4–6, ECF Nos. 77, 79).  L&W contends that Aristocrat's "sole description of its trade

17

secrets is 'the math, including the models, algorithms, and calculations'" that underly its games,

18

which is too vague. (*Id.*).  Aristocrat provided more detail about its trade secrets in two

19

declarations attached in Appendix I. (Reply 2:13–20, ECF Nos. 90, 93-1).

20

After reviewing the attached declarations and arguments from both parties, the Court

21

finds that Aristocrat has provided sufficient detail for L&W to understand the alleged trade

22

23

24

25

---

[2] Aristocrat provides sufficient evidence that this confidential information is kept secret, which L&W does not refute. Aristocrat's security measures include restrictions on access to the files containing game math, even within the company, and confidentiality provisions in employment agreements like the one Ms. Charles signed. (Primmer Decl. ¶¶ 19–22, App. I to Mot. Prelim. Inj. & Exs. B–C); (Deitz Decl. ¶¶ 20–21, App. I to Mot. Prelim. Inj.). *See MAI Sys. Corp.*, 991 F.2d at 521 (finding company took reasonable steps to protect its trade secret information by requiring employees to sign confidentiality agreements respecting its trade secrets).

secrets.  Matthew Deitz, Aristocrat head game designer, provided a declaration attached to Plaintiffs' Motion for Preliminary Injunction explaining that the spreadsheets contain trade secrets including "the mathematical parameters and associated calculations, including reel strip layouts, hit rates, probabilities and return percentages" of Plaintiffs' games. (Deitz Decl. ¶ 25, App. I to Mot. Prelim. Inj.).  He also provides nine paragraphs listing confidential trade secrets that are not publicly disclosed or available, including hit rates and average prizes for the Grand and Major Jackpots, mathematical calculations for the Hold & Spin feature for every combination of denomination played, reel strip layouts, and the mathematical model that determines the RTP[3] and hit rate of various features and prizes. *(Id.)*.  Additionally, Mr. Vancura explains that these details are not disclosed in Aristocrat's patents. (Vancura Decl. ¶ 35, App. I to Mot. Prelim. Inj.).  This level of detail seems sufficient to put L&W on notice of Aristocrat's alleged trade secrets. (*Fujikura Composite Am., Inc. v. Dee*, No. 24-CV-782 JLS (MSB), 2024 WL 3261214, at *7 (S.D. Cal. June 28, 2024) ("the reasonable particularity standard does not require explication of the trade secrets down to the finest detail or require a mini-trial on misappropriation," but rather "ensures defendants have sufficient information to prepare a rebuttal" (cleaned up)).

Next, L&W argues that the similarities found in the games are not trade secrets because they contain well-known game creation methods and can be reverse engineered.  A trade secret is not readily ascertainable by proper means, and defendants bear the burden to demonstrate that they obtained the trade secret through proper means. 18 U.S.C.A. § 1839(6)(B); NRS 600A.030(5)(a)(1).  "[I]f information is 'readily ascertainable through proper means' such as reverse engineering, it is not eligible for trade secret protection." *Insulet Corp. v. EOFlow, Co. Ltd.*, 104 F.4th 873, 882 (Fed. Cir. 2024).  However, just because "a matter may be susceptible

---

[3] "RTP" refers to the money returned to the player of the game.

of independent development or reverse engineering does not thereby make it 'generally known' or 'readily ascertainable by proper means.'" *Medtronic MiniMed, Inc. v. Nova Biomedical Corp.,* No. CV 08-900788 SJO (PJWX), 2009 WL 10672947, at *2 (C.D. Cal. Aug. 14, 2009) (explaining that because the defendants presented no evidence that it actually obtained Plaintiffs' information through proper means, it did not raise the defense).

Aristocrat's experts testified that while certain game elements such as rules, denominations, and pay tables are visible to players, the underlying mathematical algorithms are not publicly available. (*See* Deitz Decl. ¶¶ 20, 25, App. I to Mot. Prelim. Inj.); (Vancura Decl. ¶¶ 26, 52–53, App. I to Mot. Prelim. Inj.).  They further opine that it would not be feasible to reverse engineer the mathematical design of these games by observing or playing them. (Deitz Decl. ¶ 26, App. I to Mot. Prelim. Inj.); (Vancura Decl. ¶¶ 40, 44, 47, App. I to Mot. Prelim. Inj.).  Aristocrat divides its trade secrets into categories, which the Court will review in turn: (1) method of assigning prizes to SCAT2 symbols, (2) hold & spin reels and probabilities, (3) Major and Grand Jackpot information, and (4) base game math.

> i.  *Assignment of Prizes to SCAT2 Symbols*

When a SCAT2 symbol appears for a player during the base game or a bonus game, the values assigned to SCAT2 symbols are dynamically assigned on each spin. (Suppl. Vancura Decl. ¶ 28, Ex. J to App. I to Mot. Leave, ECF Nos. 80-1, 82-1).  Mr. Vancura describes this confidential method in his declaration. (*See id.* ¶¶ 28–35, 41–44).  He testified that although a player can see the potential prizes and perceive generally how often each prize may be won, they cannot discern the "under the hood" details such as the exact method, weightings, and probabilities used to control the outcome of the SCAT2 prize. (*Id.* ¶ 39).  He explained that this is because a game designer has many ways to control how prizes are assigned and could choose from a number of different probabilities for assigning the amounts. (*Id.*).  He is not aware of

1  Aristocrat publicly disclosing these methods, nor does he believe that Aristocrat's particular

2  implementation is commonly known in the industry. (*Id.*).

3      In response, L&W states that Aristocrat's method of assigning prizes is commonly used

4  throughout the industry, and L&W's earlier game, Epic Fortunes, used the same prize

5  assignment method. (Sur-Reply Nicely Decl. ¶¶ 34, 37, Ex. 9 to Sur-Reply, ECF Nos. 106-9,

6  108-9); (Sur-Reply Guerrero Decl. ¶¶ 3–6, Ex. 2 to Sur-Reply, ECF Nos. 106-2, 108-2).  In

7  2017, L&W employees Chesworth and Goodall reverse engineered certain aspects of the prize

8  distribution feature of Lightning Link and Dragon Link. (Goodall Decl. ¶¶ 4–9, Ex. 5 to Resp.,

9  ECF Nos. 77-5, 79-5).

10     L&W has not successfully refuted Aristocrat's claim that its underlying weighting and

11 probabilities are trade secrets.  Mr. Vancura details the differences and errors in L&W's earlier

12 reverse engineering attempts as compared with the actual Dragon Link game math. (Vancura

13 Reply Decl. ¶¶ 35–36, App. I to Reply, ECF Nos. 90-1, 93-1).  Additionally, Epic Fortunes

14 seemingly assigns prizes differently than Dragon Link and Dragon Train. (*See* Deitz Suppl.

15 Decl. Exs. 2–3, App. I to Mot. Leave, ECF Nos. 80-1, 82-1); (Guerrero Sur-Reply Decl. Exs.

16 A, C, ECF Nos. 106-3, 108-3).  Although it may be true that the general method of assigning

17 prizes is commonly known in the industry, the claimed trade secrets here involve the

18 probability and weight amounts, not merely the method.  And even if the method is common,

19 the exact logic and probabilities used by Aristocrat can constitute a trade secret. *See United*

20 *States v. Nosal*, 844 F.3d 1024, 1042 (9th Cir. 2016) ("The fact that some or all of the

21 components of the trade secret are well-known does not preclude protection for a secret

22 combination, compilation, or integration of the individual elements.")  Because it is actual

23 reverse engineering that serves as a defense, the Court finds Aristocrat's mathematical logic,

24 probability calculations, and weight values to constitute trade secrets.

25 ///

*ii. Hold & Spin Reels and Probabilities*

Aristocrat's next category of trade secrets involves the probabilities used during the Hold & Spin feature. (Mot. Leave 8:12–15).  The probabilities are described in Mr. Vancura's Supplemental Declaration. (*See* Vancura Suppl. Decl. ¶ 8, Ex. J. to Mot. Leave, ECF No. 80-1, 82-1).  L&W responds that the probabilities are readily ascertainable, and argues that it made earlier games with similar, or the same, probabilities. (Nicely Sur-Reply Decl. ¶ 29–33, Ex. 11 to Sur-Reply, ECF No. 106-11)  While Aristocrat points to additional similarities between the games relating to the number of SCAT2 symbols, (Vancura Suppl. Decl. ¶ 20, Ex. J. to Mot. Leave), L&W explains that any game with a certain number of SCAT2 symbols and hit rate would have similar probabilities. (Nicely Sur-Reply Decl. ¶ 33, Ex. 11 to Sur-Reply).

The Court finds L&W's arguments persuasive.  If it has also been targeting the same chance of landing a SCAT2 symbol, which can logically be determined by playing the game and noting every time a SCAT2 symbol is landed, the probability calculation may not be a trade secret.  Similarly, if the final probabilities are automatically determined by the number of SCAT2s in the game, choosing to use that number of SCATs would not qualify as a trade secret.  At this time, Aristocrat does not demonstrate that these numbers are different than what is generally known in the trade.

*iii. Major and Grand Jackpots*

Aristocrat's third category involves the probability of triggering a Grand or Major Jackpot, which it alleges is not publicly disclosed or readily ascertainable. (Vancura Suppl. Decl. ¶ 49, Ex. J. to Mot. Leave)  L&W does not claim that the turnover rate of Aristocrat's jackpots was reverse engineered, but instead references the Declaration of Ms. Charles who testified that this information was shared with customers and shared at trade shows. (Charles Decl. ¶ 9, Ex. 1 to Resp.).  In Reply, however, Aristocrat presents evidence that to the extent this information was ever shared, it was only shared with confidentiality restrictions.  Mr. Deitz

1   testified that "Aristocrat and HRG do not disclose any confidential math information outside of

2   Aristocrat and HRG except on a confidential basis," which is "consistent with industry

3   practice." (Deitz Decl. ¶ 20, App. I to Mot. Prelim. Inj.).  Because L&W fails to present

4   evidence that the information was reverse engineered or shared publicly without

5   confidentiality, the Court finds that the turnover rate of Aristocrat's jackpots is a trade secret.

6            *iv. Base Game Math*

7            Lastly, Aristocrat claims that its base game math is a trade secret and describes the many

8   choices that go into such a design. (Vancura Decl. ¶ 40, App. I to Mot. Prelim. Inj).  Mr.

9   Vancura explains the difficulties with reverse engineering these details and argues that a game

10  designer could not readily ascertain non-public information about the composition of the

11  Dragon Link base game. (*Id.*).  This information not only includes the composition and layout

12  of the base game reel strips, but also the symbol counts per reel, associated calculations, and the

13  hit rates. (Resp. to Interrogatory 28:15–18, App. I to Reply, ECF Nos. 90-1, 93-1).  Further, Mr.

14  Deitz testified that the reel strip layouts, and a fact about the base game disclosed by Ms.

15  Charles in an email to colleague, are treated as confidential and not publicly disclosed or

16  available. (Deitz Decl. ¶ 25, App. I to Mot. Prelim. Inj.).

17           L&W, in response, argues that base games can be reverse engineered and presents the

18  declarations of two former employees who testified that they reverse engineered the base game

19  of Lightning Link, the predecessor game to Dragon Link, using YouTube footage. (Guerrero

20  Decl. ¶5, ECF Nos. 77-7, 79-6); (Chesworth Decl. ¶¶ 5–10, ECF Nos. 77-2, 79-2).  However,

21  L&W did not provide the reconstructed base game, so the Court has no way to tell whether it

22  was successfully reverse engineered correctly.  And even if aspects of the base game were

23  correctly reverse engineered, the fact remains that Dragon Train was not released until after

24  Ms. Charles joined the team, bringing Aristocrat's trade secrets with her.  L&W does not

25  demonstrate how the exact reels and base game math for Aristocrat's Dragon Train are readily

ascertainable, particularly when considering the difficulties raised by Aristocrat's expert.  The Court thus concludes that base game information constitutes a trade secret.

### 2. Misappropriation

A misappropriation claim under the DTSA or NUTSA requires a showing of (1) acquisition of a trade secret by a defendant that knows or has reason to know was acquired by improper means, or (2) disclosure or use of a trade secret by a defendant that knew or had reason to know that the trade secret was (i) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret; or (ii) derived from or through a person who owed a duty to maintain the secrecy of the trade secret. *See* 18 U.S.C. § 1839(5)(A), (B)(ii)(II)–(III); NRS 600A.030(2)(a), (c)(2)(II)–(III).  "Improper means" include "breach or inducement of a breach of a duty to maintain secrecy . . . ." 18 U.S.C. § 1839(6)(A).

Aristocrat has shown a fair chance of success on its trade secret misappropriation claim by demonstrating that L&W acquired their trade secrets by hiring Ms. Charles.  Under the NTSA and DTSA, simply acquiring a trade secret through improper means constitutes misappropriation. *See* NRS § 600A.030(2)(a) (defining misappropriation as the "[a]cquisition of the trade secret of another by a person by improper means"); 18 U.S.C. § 1839(5)(A) (defining misappropriation as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means").

Aristocrat identified three instances in which L&W acquired its trade secrets through Ms. Charles.  First, in September 2022, Ms. Charles sent a worksheet containing confidential information for the Dragon Link base game, to a colleague, for a reverse engineering training exercise. (Email, Ex. M to App. II to Mot. Prelim. Inj., ECF No. 52-2)  This spreadsheet has an identical layout to a spreadsheet Ms. Charles created while at Aristocrat and even contains identical formatting errors such as an odd border around one blank row, gray highlighting on the same four empty cells, and the same missing border on one cell in the same position.

1    (Comparison, Ex. O to App. II to Mot. Prelim. Inj., ECF No. 52-2).  Second, in the body of the

2    email, Ms. Charles shared additional confidential information about the Dragon Link games.

3    (Email, Ex. M to App. II to Mot. Prelim. Inj.).  And third, in a Teams message to a colleague,

4    she sent confidential information about Dragon Link's Grand Jackpot. (Messages, Ex. P to

5    App. II to Mot. Prelim. Inj., ECF No. 52-2).

6         This information was acquired and disclosed by "improper means" because as part of

7    her employment agreement with Aristocrat, Ms. Charles contracted not to disclose Confidential

8    Information. (Charles Contract, Ex. B to App I to Mot. Prelim. Inj.).  Confidential information

9    was defined to include trade secrets and game designs, and the contract prohibited the "use" of

10   trade secrets or allowing others to use them. (*Id.*).  This confidentiality agreement remained in

11   effect even after she left Aristocrat. (*Id.*); (Primmer Decl. ¶ 21, App. I to Mot. Prelim. Inj.).

12   Ms. Charles appears to have breached her confidentiality agreement by disclosing Aristocrat's

13   trade secrets to colleagues at L&W.

14        L&W also likely knew or had reason to know that the game math and spreadsheet were

15   improperly acquired because game math is known in the industry to be highly confidential and

16   proprietary. (*See* Primmer Decl. ¶ 21, App. I to Mot. Prelim. Inj.); (Deitz Decl. ¶ 20, App. I to

17   Mot. Prelim. Inj.); (Vancura Decl. ¶ 52, App. I to Mot. Prelim. Inj); *see, e.g., Lilith Games*

18   *(Shanghai) Co. Ltd. v. uCool, Inc.*, No. 15-CV-01267-SC, 2015 WL 4128484, at *3 (N.D. Cal.

19   July 8, 2015) ("[I]t is reasonable to infer that [the defendant] knew the code was acquired

20   through improper means or in breach of a duty because [the trade secret plaintiff] would not

21   have given its competitor . . . free access to its code.").  And when L&W hired Ms. Charles, it

22   advertised the fact that she worked on Lightning Link for many years. (Deitz Decl. ¶ 30, App. I

23   to Mot. Prelim. Inj.).

24        But even more than merely acquiring trade secrets, Aristocrat presents persuasive

25   evidence that Aristocrat's Dragon Link trade secrets were used by L&W in the development of

Dragon Train. On August 2, 2024, after Aristocrat filed its Motion for Preliminary Injunction, it filed a Motion for Leave to Supplement the underlying motion based on newly acquired evidence: a worksheet named "Dragon Train Game 5.xlsx" retrieved from Ms. Charles' computer containing the mathematical design of Dragon Train. (Mot. Leave 1:6–7); (Charles Suppl. Decl. ¶ 2, Ex. 1 to Sur-Reply, ECF Nos. 106-1, 108-1). Aristocrat's presentation to the Court at the hearing on the instant motion contained slides with side-by-side comparisons of L&W's Dragon Train spreadsheet next to a Dragon Link spreadsheet created by Ms. Charles when she was employed at Aristocrat in 2013. These comparisons demonstrated many striking similarities.

To begin with, Dragon Train uses the same method to assign prizes to SCAT2 symbols, with the same table value overlap and similar prize amounts. (Vancura Suppl. Decl. ¶¶ 30–44, Ex. J. to Mot. Leave). Notably, while some of Aristocrat's methods were not identified by L&W's reverse engineering, they still somehow appeared in Dragon Train's final game math. The overlap makes the possibility of trade secret use more likely, because there is no evidence of reverse engineering, and a player would have no way of knowing where the assigned prizes came from. Additionally, both games have an identical Major Jackpot probability, which would be highly unlikely to surmise without some evidence of copying, given the difficulty and rarity of winning a Major Jackpot and the multiple ways it can be won. (*Id.* ¶ 49). Mr. Vancura further identified in a list many similarities in the base game of both games, many of which are arbitrary and have no actual effect on gameplay, yet they still appear in both games and seem to have been copied. (*Id.* ¶¶ 47–51).

After briefing on this Motion concluded, L&W produced documents providing additional evidence that Ms. Charles based the Dragon Train game math on Aristocrat's game math files she created while employed there. One of these files, referred to as the "Inception Conception" spreadsheet, was a math file used to create L&W's Sky Train, an early version of

1   Dragon Train. (Inception Conception Spreadsheet, Ex. 5 to Not. Manual Filing, ECF No. 114).

2   Although this was a L&W spreadsheet, its creation date is November 12, 2013, which was

3   during Ms. Charles' employment at Aristocrat. (*Id.*).  November 12 is also the same date and

4   time noted as the creation date on Aristocrat's original Dragon Link spreadsheet submitted with

5   its Preliminary Injunction Motion. (Dragon Link Spreadsheet, Ex. G to App. I. to Mot. Prelim.

6   Inj., ECF No. 52-1); (Inception Conception Spreadsheet, Ex. 5 to Not. Manual Filing).  Side by

7   side, the Dragon Link spreadsheet and Inception Conception spreadsheet contain many

8   similarities including labels, headings, formatting, highlighting, symbols, wild clusters, and

9   Hold & Spin prizes and probabilities. (*Id*).  L&W also produced a second math spreadsheet

10  with the same November 2013 creation date as the Dragon Link spreadsheet and Inception

11  Conception spreadsheet. (Ex. 3 to Not. Manual Filing).  It appears that the game designers

12  tweaked a few numbers and changed royal symbols, but much of the underlying math and

13  probabilities remained the same.

14          Aristocrat further presents evidence that even though Ms. Charles stated she never

15  sought to copy from Dragon Link, an internal L&W PowerPoint stated L&W's desire to

16  "preserve as many of the important elements in [Dragon Link] as we can, while offering a new

17  and exciting experience." (L&W PowerPoint at 9, Ex. 2 to Not. Manual Filing, ECF No. 114).

18  It notes their overall goal of adding a "twist" to Dragon Link, and states that Dragon Link is at

19  the top of the charts in Australian and American markets. (*Id.*).  And in another Dragon Train

20  spreadsheet, a cell contains a note that the sales pitch is to make Dragon Train "just like Dragon

21  Link, but cheaper and more depth for the real punter." (Sheet 5 Tab, Ex. Q to App. II to Mot.

22  Prelim. Inj., ECF No. 52-2).  Thus, the logical and reasonably likely conclusion is that Dragon

23  Train began its initial development by starting with the actual Dragon Link math.

24          L&W fails to counter this evidence with a persuasive explanation or reasonable

25  alternative theory.  First, it argues that the Dragon Train spreadsheet was developed after the

math was finalized. (Sur-Reply 3:7–11).  Aristocrat counters this argument by providing evidence that although the spreadsheet was last modified July of 2023, it was created in August 2022, before Dragon Train math was finalized.  Dragon Train launched in Australia in August 2023.

L&W also argues that it has not misappropriated Aristocrat's trade secrets because its final game math differs in certain aspects, and it has an additional bonus feature.  This argument not only misunderstands trade secret law but misunderstands Aristocrat's claim.  Aristocrat does not argue that Dragon Train is a replica of Dragon Link; rather, its claim is based on substantial critical similarities that appear to arise out of shared spreadsheets.  Given the strong circumstantial evidence supporting the allegation that Ms. Charles began with a Dragon Link math spreadsheet and then made tweaks to it, the fact that some of the final math differs does not mean Aristocrat's trade secret misappropriation claim would fail.  "In the context of trade secret misappropriation, information may be improperly 'used' in that it is unlawfully acquired and then built upon or modified before being disclosed or benefit derived." *SkinMedica, Inc. v. Histogen Inc.*, 869 F. Supp. 2d 1176, 1197 (S.D. Cal. 2012); *see also Am. Can Co. v. Mansukhani*, 742 F.2d 314, 328–29 (7th Cir. 1984) ("If the law were not flexible enough to reach [independent] modifications, trade secret protection would be quite hollow").  Evidence demonstrates that the games are still materially similar, even after the developers made tweaks.

Two of Dragon Train's game designers, Soo and Leontiev, testified that they independently developed a math model used in Dragon Train. (Soo Decl., Ex. 7 to Resp.); (Leontiev Decl., Ex. 8 to Resp.).  Leontiv specifically stated that he did not rely on any game design documents relating to Dragon Link when formulating the math model used in Dragon Train. (Leontiev Decl. ¶ 9, Ex. 9 to Resp.).  But even so, Excel spreadsheet data demonstrates that both Soo and Leontiev modified L&W spreadsheets created by Ms. Charles that appear to

have been copied from a Dragon Link spreadsheet she created at Aristocrat. (Exs. 4, 6 to

Manual Filing, ECF Nos. 114-4, 114-6).

Lastly, L&W asserts that any "arbitrary and idiosyncratic" similarities between the

spreadsheets are simply due to Ms. Charles' personal spreadsheet preferences. (Sur-Reply

10:23–12:8).  L&W contends that because Ms. Charles was involved with the development of

both games, it is unsurprising for the spreadsheets of both games to contain similarities in

formatting, weight sums, and reel lengths. (*Id.*).  But that justification does not quite explain the

formatting mistakes that appear to be copied between spreadsheets.  For example, not only are

the colors, tabs, and layouts almost identical, but they contain similar formatting errors such as

a border around the same blank row, gray highlighting in the same empty cells, and the same

missing border on an identical cell. (Comparison, Ex. O to App. II to Mot. Prelim. Inj.).  These

mistakes have seemingly been copied into the L&W spreadsheet from an Aristocrat

spreadsheet, which lends support to Aristocrat's position that Ms. Charles brought confidential

spreadsheets to L&W.  The likelihood that Ms. Charles brought a blank template with her to

L&W seems belied by the mathematical similarities described above.  The Court therefore

finds it logical and reasonable to conclude Aristocrat is extremely likely to succeed in

demonstrating L&W misappropriated Aristocrat's trade secrets in its development of Dragon

Train.

## B.  Irreparable Harm

Plaintiff must "demonstrate a likelihood of irreparable injury—not just a possibility—in

order to obtain preliminary relief." *Winter*, 555 U.S. at 21.  "Alleged harm that is remote or

speculative will not be considered irreparable; rather, the movant must demonstrate that the

threatened harm is imminent." *Lilith Games*, 2015 WL 5591612, at \*10.  Public disclosure of a

trade secret destroys the information's status as a trade secret. *See Ruckelshaus v. Monsanto

Co.*, 467 U.S. 986, 1002 (1984).  This harms the trade secret owner by both depriving him of a

property interest and by allowing his competitors to reproduce his work without an equivalent investment of time and money. *See Winston Research Corp. v. Minnesota Min. & Mfg. Co.*, 350 F.2d 134, 142 (9th Cir. 1965). Similarly, disclosure of non-trade secret confidential information is also recognized as a serious harm. *Union Pacific R.R. Co. v. Mower*, 219 F.3d 1069, 1071 n. 1 (9th Cir. 2000).

The Court finds that Aristocrat has demonstrated a likelihood of irreparable harm if L&W is allowed to continue profiting from a game created with the misappropriation of Aristocrat's trade secrets. L&W misappropriated Aristocrat's trade secrets and was able to develop Dragon Train without investing the equivalent time and money. A competitor's use of trade secrets gives them an unfair advantage, and injunctions can be used to prevent this unfair advantage. *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991). Aristocrat further provides an email and Teams message demonstrating that Ms. Charles has disclosed their trade secrets to particular colleagues, and L&W will likely be making new versions of Dragon Train, which puts Aristocrat at risk of further dissemination of its trade secrets. Other courts have similarly recognized that disclosure of trade secrets to a competitor can constitute irreparable harm. *See, e.g., Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 919 (D. Nev. 2006); *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 853 (N.D. Cal. 2019). Additionally, as Dragon Train has recently overtaken Dragon Link as the number one game for new placements among premium games, Aristocrat has demonstrated sufficient evidence of potential market share loss. (Hansen Reply Decl. ¶ 90, App. I to Reply, ECF Nos. 90-1, 93-1).

### C. Balance of Hardships

"In cases where a plaintiff has shown a defendant is likely misappropriating a trade secret, courts have routinely held that the degree of hardships favors the plaintiff." *ImageKeeper LLC v. Wright Nat'l Flood Ins. Servs. LLC*, No. 2:20-CV-01470-GMN-VCF, 2020 WL 4677299, at *4 (D. Nev. Aug. 12, 2020); *WeRide Corp.*, 379 F. Supp. 3d at 853.

1    Aristocrat argues that because L&W decided to launch Dragon Train in the U.S. after it put

2    L&W on notice of its trade secret misappropriation claim, it cannot now "complain of the harm

3    that will befall it when properly forced to desist from its infringing activities." (Mot. Prelim.

4    Inj. 23:27–24:7) (citing *Samick Music Corp. v. Gordon*, No. SACV 20-395-GW-JDEx, 2020

5    WL 3210613, at *11 (C.D. Cal. 2020).  L&W counters that a wrongfully issued injunction

6    would be devastating because Dragon Train represents millions of dollars and years of

7    investment. (Resp. 21:23–24).

8         The Court finds that the balance of hardships favors Aristocrat.  L&W is using

9    Aristocrat's trade secrets in its Dragon Train games, therefore, imposing this preliminary

10   injunction will not harm any of L&W's legitimate business and will only protect Aristocrats'

11   rights in their trade secrets.  L&W had the option of resolving Aristocrat's claims before it

12   launched its product in the U.S. but chose not to.[4]

13        **D.  Public Interest**

14        Public interest also weighs in favor of granting the preliminary injunction.  "The public

15   interest analysis for the issuance of [injunctive relief] requires [district courts] to consider

16   whether there exists some critical public interest that would be injured by the grant of

17   preliminary relief." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir.

18   2011) (citation omitted).  "The public interest inquiry primarily addresses [the] impact on non-

19   parties rather than parties." *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 974 (9th Cir.

20   2002).  As another court in this district has held, "there is a strong public interest in protecting

21   trade secrets, as evidenced by the existence of the DTSA and [NUTSA]." *Protection Techs.,*

22   *Inc. v. Ribler*, No. 3:17-cv-00144-LRH-WGC, 2017 WL 923912, at *3 (D. Nev. Mar. 8, 2017).

23   L&W argues that enjoining Dragon Train would stifle legitimate competition and deprive

24   _____

25   [4] In September 2023, Aristocrat shared its trade secret concerns with L&W's counsel in Australia, where Dragon Train was
     first launched. (Swanson Decl., App. II to Mot. Summ. J., ECF No. 52-2).  Despite the litigation disputes in Australia, L&W
     moved forward with its plans to launch Dragon Train in the U.S. market. (*Id.*).

casinos and customers from leveraging a game they have already purchased or planned to purchase. (Resp. 22:26–23:5).  But the public interest in protecting trade secrets and preventing competitors from receiving an unfair advantage, outweighs both the harm to consumers having one less game to play and the harm to casinos from removing the game until this lawsuit concludes.

Accordingly, Aristocrat successfully demonstrates that all *Winter* factors weigh in its favor, and the Court GRANTS their request for a preliminary injunction.

### E. Bond

Under the Federal Rules, "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." Fed. R. Civ. P. 65(c).  L&W requests a bond of $49 million if the injunction is granted, based on Dragon Train's revenue projections. (Resp. 23:11–19).  L&W states that enjoining the commercialization of Dragon Train and their future game development "would cause serious damage" to their business. (*Id.*).  Aristocrat responds that $49 million is based on speculative revenue, and the courts more often look to profits, not revenue, to set a bond amount. (Reply 12:7–22).  It contends that L&W's assumption that it will lose all revenue is unlikely because withdrawn Dragon Train games may be replaced by other L&W games, resulting in minimal lost profits. (*Id.*).  Aristocrat proposes either a nominal bond or a bond of $1.2 million to $3.0 million based on potential lost profits. (*Id.*); (Hansen Reply Decl. ¶¶ 37–40, App. I to Reply). L&W declined to provide an alternative lost profits amount.

The Court agrees that a bond of $1 million is appropriate to account for L&W's potential profit loss.  The $1 million bond is based on projected profits from L&W's lost revenue and assumes that L&W will be able to mitigate its damages by replacing certain Dragon Train games already on casino floors or on internet game sites or apps with other L&W games, which

L&W has not persuasively disputed. (Tr. 87:1–5; 167:21–168:3, ECF No. 117).  Accordingly, the Court ORDERS that the preliminary injunction shall not issue or be effective until the posting of a bond by Aristocrat in the amount of $1 million.

## IV.    **CONCLUSION**

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Preliminary Injunction, (ECF No. 52), is **GRANTED**.

**IT IS FURTHER ORDERED** that L&W is hereby enjoined, pending a final determination on the merits, from using or disclosing any of Plaintiffs' trade secrets (as described in this Order) or other confidential and proprietary information relating to the mathematical design of Dragon Link and Lightning Link ("Plaintiffs' Trade Secrets").  The enjoined use or disclosure

includes without limitation 1) any current or planned game development efforts that would involve the use or disclosure of Plaintiffs' Trade Secrets; and 2) any continued or planned sale, leasing, or other commercialization of Dragon Train.  L&W is further enjoined from accessing, transferring, copying, disseminating, modifying, or destroying any documents or materials in L&W's possession, custody, or control reflecting Plaintiffs' Trade Secrets, except to the extent necessary to comply with this order.

**IT IS FURTHER ORDERED** that within 30 days of this Order, L&W shall:

A. Search for and identify all documents and materials in its possession, custody, or control reflecting Plaintiffs' Trade Secrets;

B. Provide an accounting that describes with specificity every document identified in its search, including the (i) title, (ii) date, (iii) subject or description, (iv) any sender or recipient, (v) location where found, and (vi) any attachments;

C. Isolate all documents and materials identified in its search so that they cannot be

used, accessed, transferred, copied, disseminated, modified, or destroyed (including, if necessary, via suspension of any automated deletion processes and retrieval of any company devices issued to employees);

D. Provide an accounting to Aristocrat's counsel in this case that describes with specificity every instance in which L&W has disclosed Plaintiffs' Trade Secrets, including the (i) name of the person or entity to which the information was disclosed, (ii) date of disclosure, (iii) specific information disclosed, (iv) reason for disclosure, and (v) all documents or materials reflecting the disclosure; and

E. File in this case docket a certification of compliance with the requirements provided in this Order.

**IT IS FURTHER ORDERED** that the preliminary injunction issued herein shall be effective upon the posting of a bond by Aristocrat in the amount of $1 million.

**DATED** this   20   day of September, 2024.

_____
Gloria M. Navarro, District Judge
UNITED STATES DISTRICT COURT