PHILIP R. ERWIN, ESQ. (11563)
pre@cwlawlv.com
CAMPBELL & WILLIAMS
710 South Seventh Street, Suite A
Las Vegas, Nevada 89101
Telephone: (702) 382-5222
Facsimile: (702) 382-0540

NEAL MANNE *(Pro Hac Vice)*
nmanne@susmangodfrey.com
ROCCO MAGNI *(Pro Hac Vice)*
rmagni@susmangodfrey.com
JOSEPH GRINSTEIN *(Pro Hac Vice)*
jgrinstein@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

ERIK WILSON *(Pro Hac Vice)*
ewilson@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

ANDREW NASSAR *(Pro Hac Vice)*
anassar@susmangodfrey.com
SUSMAN GODFREY L.L.P.
One Manhattan West, 50th Floor
New York, New York 10001
Telephone: (212) 336-8330
Facsimile: (212) 336-8340

*Attorneys for Defendants Light & Wonder, Inc.,*
*LNW Gaming, Inc., and SciPlay Corporation*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

|  |  |
|---|---|
| ARISTOCRAT TECHNOLOGIES, INC. and ARISTOCRAT TECHNOLOGIES AUSTRALIA PTY LTD., <br><br> Plaintiffs, <br><br> v. <br><br> LIGHT & WONDER, INC., LNW GAMING, INC., and SCIPLAY CORPORATION, <br><br> Defendants. | Case No. 2:24-cv-00382-JCM-MDC <br><br> **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE PRELIMINARY INJUNCTION** <br><br> **(HEARING REQUESTED)** <br><br> **(FILED UNDER SEAL)** |

**FILED UNDER SEAL**

1

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

    I.     The District Court Issued an Injunction Relating to Dragon Train's Alleged Misappropriation of Trade Secrets from Dragon Link and Lightning Link ................................................................................................ 2

    II.    L&W Undertook Comprehensive Efforts to Comply with the Order ................... 3

          A.     L&W Removed Dragon Train from the Market ........................................ 5

          B.     L&W Implemented Multiple Search Methods to Segregate Challenged Files ...................................................................................... 6

          C.     L&W Submitted Detailed Accountings to Aristocrat ............................... 9

    III.   Discovery Is Ongoing, and L&W Continues to Comply with the Injunction in Good Faith. ...................................................................................... 10

ARGUMENT ..................................................................................................................... 11

    I.     L&W Has Complied With the Preliminary Injunction. ....................................... 13

          A.     L&W's Search Protocols Were Sufficient and Extended Beyond Dragon Train ......................................................................................... 13

          B.     L&W Provided Detailed Accountings As Required by the Order ............ 18

    II.    Even if the Court Finds L&W Did Not Guarantee It Found Every Last Possible Document, Discovery Is Ongoing and Sufficient to Address Aristocrat's Concerns. ......................................................................................... 20

CONCLUSION .................................................................................................................. 22

FILED UNDER SEAL

# TABLE OF AUTHORITIES

*Balla v. Idaho State Bd. of Corr.*,
    869 F.2d 461 (9th Cir. 1989)................................................................................. 12

*California Dep't of Soc. Servs. v. Leavitt*,
    523 F.3d 1025 (9th Cir. 2008)............................................................................... 11

*Desirous Parties Unlimited Inc. v. Right Connection Inc.*,
    2022 WL 17417857 (D. Nev. Dec. 5, 2022),
    *aff'd*, 2023 WL 4285504 (9th Cir. June 30, 2023)........................................... 11, 12

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*,
    10 F.3d 693 (9th Cir. 1993).................................................................................. 11

*Exel N. Am., Inc. v. Integrated Dispense Sols. LLC*,
    2015 WL 163990 (E.D. Mich. Jan. 13, 2015)....................................................... 21

*MedioStream, Inc. v. Microsoft Corp.*,
    869 F. Supp. 2d 1095 (N.D. Cal. 2012) ............................................................... 18

*Pyro Spectaculars N., Inc. v. Souza*,
    861 F. Supp. 2d 1079 (E.D. Cal. 2012)................................................................ 21

*Shell Offshore Inc. v. Greenpeace, Inc.*,
    815 F.3d 623 (9th Cir. 2016)................................................................................ 20

**FILED UNDER SEAL**

Defendants Light & Wonder, Inc., LNW Gaming, Inc., and SciPlay Corporation ("L&W") hereby file this Opposition to Plaintiffs Aristocrat Technologies, Inc. and Aristocrat Technologies Australia Pty Ltd.'s ("Aristocrat's") Motion to Enforce the Preliminary Injunction ("Motion"), ECF No. 158.

**INTRODUCTION**

Since the Court issued its preliminary injunction, L&W has conducted a global effort in a short amount of time to not only remove Dragon Train from casinos, but to purge the company's global systems of Dragon Train math materials. Aristocrat does not take issue with L&W's compliance with the core of the order, such as ceasing Dragon Train commercialization and remediating Dragon Train math model documentation. Instead, Aristocrat complains about issues on the peripheries. Despite L&W's overly-inclusive search protocol, its continued willingness to revise its injunction compliance protocol, and the extremely broad discovery L&W is providing in parallel with the steps required by the injunction, Aristocrat is focused on bringing *some* dispute to the Court.

This Court should deny Aristocrat's motion for two reasons. First, L&W has complied with the preliminary injunction. Despite significant logistical difficulties and a short timeframe for compliance, L&W worked to remove thousands of Dragon Train units from casinos around the globe. Using a team of outside data consultants, L&W also scoured dozens of servers and file repositories to remove Dragon Train files so that employees would no longer have access to them. And, as it did all this, L&W prepared detailed accountings of the documents and disclosures it identified so that Aristocrat and the Court could understand its review.

Second, confirming perfection at a global enterprise level is impossible, which is why the standard is "substantial compliance" with an injunction—not "perfect" compliance. No search can guarantee perfection, and to search even more broadly than L&W already has would require taking

**FILED UNDER SEAL**

active servers offline and out of business use for extended periods, collecting and duplicating documents across systems of a global company, waiting months for tools to process and index company files for search term functionality, and investing vast resources and months of personnel review time to review any search hit. Given such impossibilities and the realities of global IT infrastructure, issues sometimes arise on the peripheries of injunction compliance, but those are not grounds for an unnecessary motion to "enforce" so long as a party is not intentionally evading compliance and endeavors to remedy those issues. Moreover, discovery is ongoing in this case and, as counsel for L&W completes review of electronically stored information ("ESI") collections, counsel will of course adjust the scope of all injunction compliance efforts if necessary. Indeed, one such instance occurred recently. REDACTED

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████. As a result, L&W's proactive approach obviates the need for court intervention. This Court should deny Aristocrat's motion because there is no legal basis to coerce enforcement of an injunction with which L&W is already complying.

## BACKGROUND

**I.    The District Court Issued an Injunction Relating to Dragon Train's Alleged Misappropriation of Trade Secrets from Dragon Link and Lightning Link**

On September 23, 2024, this Court entered an order granting Aristocrat's motion for a preliminary injunction (the "Order" or "Preliminary Injunction"). ECF No. 125. The Court held that Aristocrat was likely to succeed on the merits of its claim that L&W misappropriated certain aspects of Aristocrat's Dragon Link and Lightning Link games in the development of L&W's Dragon Train game. *Id.* at 16.

FILED UNDER SEAL

1    The Order imposes three categories of requirements on L&W. First, it enjoined L&W "from

2    using or disclosing any of Plaintiffs' trade secrets (as described in this Order) or other confidential

3    and proprietary information relating to the mathematical design of Dragon Link and Lightning Link

4    ('Plaintiffs' Trade Secrets')." *Id.* at 20. The Preliminary Injunction also covered "any continued or

5    planned sale, leasing, or other commercialization of Dragon Train," L&W's game. *Id.* Second, the

6    Court ordered L&W to identify, isolate, and provide an accounting of all documents and materials

7    in its possession reflecting those trade secrets. And third, the Order required L&W to provide an

8    accounting describing every instance in which L&W has disclosed Plaintiffs' trade secrets. *Id.* at

9    20–21.

10   With respect to "Plaintiffs' Trade Secrets," the Court defined that term by reference to

11   Dragon Link and Lightning Link. *See* ECF No. 125 at 2 ("At the core of this suit is Aristocrat's

12   belief that L&W's Dragon Train was developed using Dragon Link game math that it acquired

13   through the hiring of Ms. Emma Charles."). The alleged trade secrets consist of certain

14   mathematical values, statistical choices, and backend slot machine calculations, but they all fall

15   within the umbrella of Dragon Link and Lightning Link. Indeed, the two declarations cited by the

16   Court from Matthew Deitz and Olaf Vancura solely discuss Aristocrat's trade secrets in relation to

17   Dragon Link and Lightning Link. *See id.* at 5–6 (describing the declarations of Dietz and Vancura

18   as sources of the Court's understanding of the trade secrets); *see also* ECF No. 52-1 at Appx. 93–

19   98 (¶¶ 22–28), 122–23, 134–40 (¶¶ 35–53).

## II.  L&W Undertook Comprehensive Efforts to Comply with the Order

Since the Court entered the injunction, L&W has worked diligently to comply with it,

developing its compliance plan as soon as the Order issued.[1] L&W retained experienced external

---

[1] L&W noticed an appeal of the Preliminary Injunction order, but withdrew that notice and has focused instead on compliance. *See* ECF Nos. 129 & 138 (notice of appeal); 148 (voluntary dismissal of appeal).

**FILED UNDER SEAL**

consultants. It convened meetings of IT specialists skilled in forensic document collection. And it came up with solutions. When L&W was unclear about what the Order required, it sought clarification. *See* ECF No. 132. When L&W realized compliance would take longer due to external factors beyond its control, it timely asked for an extension. *See* ECF No. 118.

All of these facts point in the same direction: L&W has acted in good faith and fulfilled its obligations under this Court's order. On October 23, 2024, L&W submitted its Certification of Compliance to the Court and its accounting to Aristocrat regarding its injunction compliance efforts ("October 23 Certification"). ECF No. 154. As part of its certification, L&W included declarations from Siobhan Lane, its Executive Vice President and CEO of Gaming, and Kevin Kealy, its Chief Information Security Officer. ECF Nos. 154-1 & 154-2. Ms. Lane certified that L&W promptly began working to comply with the Preliminary Injunction's requirement as soon as it was issued. *See* ECF No. 154-1 at 3–4. Mr. Kealy described L&W's process for identifying and segregating all relevant documents, as required by the Order. As described below, L&W canvassed over a thousand employees, ran keyword searches across 25 servers and 47 external file repositories, and developed custom scripts to identify and secure potentially relevant documents. *See id.* at 4–5. Mr. Kealy also certified that "L&W is in compliance with the Court's prohibition from using or disclosing any of Plaintiffs' claimed trade secrets identified in the . . . Order." ECF No. 154-2 at 3.

To avoid any disputes over the scope of injunction compliance, L&W intentionally adopted an over-inclusive approach to document collection. Rather than just segregate Dragon Train documents containing information the Court identified as an alleged Aristocrat trade secret, L&W segregated all relevant math-related Dragon Train files. Given that the Court's order (as proposed by Aristocrat) described Aristocrat's alleged trade secrets in broad terms but without reference to

**FILED UNDER SEAL**

specific mathematical values, L&W's compliance approach saved the parties from future disputes about which part of the math was purportedly a trade secret and which was not.[2]

After the October 23 Certification, L&W continued its work to comply with remaining aspects of the Order and supplemented its certification and accounting on November 6 ("November 6 Supplemental Certification"). ECF No. 155. In addition to providing Aristocrat and the Court with updated declarations from Ms. Lane and Mr. Kealy, L&W also submitted a declaration from one of its outside data security consultants, James Vaughn. ECF No. 155-3. These declarations described in detail L&W's data search and segregation protocols, as well as its efforts at removing Dragon Train units from casinos around the world in a short period of time.  As detailed below, L&W's two certifications and accountings show it went to great lengths to comply with each aspect of the Preliminary Injunction and satisfactorily did.

### A.    L&W Removed Dragon Train from the Market

Immediately following the Order, L&W began removing existing Dragon Train games from the market and navigating the regulatory maze associated with such a global operation. The Preliminary Injunction enjoined "any continued or planned sale, lease, or other commercialization of Dragon Train," which L&W interpreted to mean it was required to withdraw Dragon Train from the market. ECF No. 125 at 20. That is exactly what L&W did.

L&W took down all online versions of Dragon Train so that they could no longer be used. *See* ECF No. 154-1 at 4. Complying with the injunction's requirements for physical units of Dragon Train proved more difficult, but L&W devised a strategy to ensure compliance. There were 2,265 Dragon Train units in North America, and L&W converted 2,020 to other game titles by October

---

[2] As an example, the math files containing Aristocrat's purported trade secrets concern base games with five reels. Presumably even Aristocrat would not claim that a five-reel base game is its trade secret. But an approach to injunction compliance that focused on mathematical values would have required a value-by-value analysis of what Aristocrat claims is confidential and what it does not. L&W's solution of simply segregating *all* relevant Dragon Train math documents avoided this exercise, to Aristocrat's benefit.

FILED UNDER SEAL

23. *Id.* at 4. For the remaining 245 units, L&W instructed the operators to physically turn them off pending conversion and certified to the Court its understanding that they did so. ECF No. 155-1 at 3. L&W undertook similar efforts in other countries. *See id.*

L&W also completely stopped work on Dragon Train and its commercialization. *See* ECF No. 154-1 at 3–4. It terminated Dragon Train's designer on October 1, 2024, and ceased all development on current or future Dragon Train games using existing Dragon Train math. *See id.* L&W stopped shipping new orders of Dragon Train and halted all planned sales and leases of the game. *See id.*

**B.    L&W Implemented Multiple Search Methods to Segregate Challenged Files**

L&W also developed and implemented a search protocol to identify any documents potentially containing Plaintiffs' alleged trade secrets in the short timeframe provided by the Order. To start, L&W recruited a team of outside consultants from iDiscovery Solutions ("iDS"), a firm specializing in digital forensics and information governance, to manage the effort. *See* ECF No. 155-3 at 3. Fifty-four L&W employees joined iDS's efforts, working virtually around the clock, to review every repository that could contain Aristocrat's trade secrets across a global company. In sum, the team reviewed more than 25 servers and 47 file repositories across 10 countries to identify and segregate all files potentially containing the information identified in the Order. *See* ECF Nos. 154-2 at 4; 155-2 at 3.

At the outset, the team had to develop an approach to identifying files containing the alleged trade secrets in the timeframe called for by the Order. Searching file contents across an entire global company at an enterprise level was a practically and logistically infeasible way to comply with the Order. New software and new search scripts would need to be created for systems that do not natively support content-based searches. Not only would such an exercise take many months to complete—past the time by which L&W was ordered to comply with the Order—but it would also

FILED UNDER SEAL

require disabling servers for extended periods of time, effectively preventing L&W from running its business (which is obviously made up of far more than just Dragon Train). *See* Declaration of James Vaughn ("Vaughn Decl."), at 2. With L&W's enterprise systems, the time for compliance, and the scope of the search, L&W could not simply "control F" for, as an example, a value in a Lightning Link weight table. Instead, it had to devise sophisticated solutions for this complex problem.

The L&W team crafted a search protocol sufficient to comply with the Preliminary Injunction that could be implemented within the required time frame and satisfactorily identify the information subject to the Order. As part of that protocol, L&W and its team of experts developed custom scripts to conduct searches across its systems to identify files and folders containing material responsive to the Order. The vast majority of these systems do not support content-based searches within files, so the scripts identified files and folders across systems that hit on relevant search terms. *See id.* at 2–3.

The searches are time and resource intensive. Some searches across entire servers take multiple days to run. On top of that, providing server permissions and troubleshooting connections regularly calls for complex and bespoke solutions. *See* ECF No. 155-3 at 4. For each server and file repository, L&W had to customize its searches so that they were compatible across systems. *See* ECF No. 154-2 at 5.

To manage these limitations, L&W, iDS, and counsel collaboratively crafted search terms based on eleven phrases[3] derived from investigation and fed them into their scripts to identify files

---

[3] L&W used the following search terms: *Chi Lin*, *ChiLin*, *Dragon Link*, *Dragon Train*, *DragonLink*, *DragonTrain*, *Emperor Game*, *EmperorGame*, *Forever Emperor*, *ForeverEmperor*, *Golden Century*, *GoldenCentury*, *Inception*, *Khutulun*, *Lightning Link*, *LightningLink*, *Sun Shots*, and *SunShots*. *See* Swanson Decl., Ex. A at 1. L&W originally used DT as a search term for Dragon Train, *see* ECF No. 154-2 at 4–5, but dropped it by the time of the November 6 accounting because abbreviations, such as DL, LL, and DT, produced too many false positive hits. *See* Swanson Decl., Ex. F at 6.

**FILED UNDER SEAL**

and folders responsive to the Order. *See* Vaughn Decl., at 2–3. To be sure, not every document containing information on the Dragon Link game will have "Dragon Link" in the file name. But because files tend to be organized into logical families, Dragon Link files are likely to be located within a folder or file structure that, somewhere along the file pathway, says "Dragon Link." L&W segregated all files within a folder that contained one of the search terms in its name, including subfolders and their contents that do not contain "Dragon Link" or any other search term in their names. *See id.* So even if a certain file did not contain one of the search terms in its name, it was still segregated if it was stored in a folder or file structure that did. *See id.* at 3.

Contrary to Aristocrat's portrayal of L&W's injunction compliance, broad-based searches across servers were just the start of L&W's search protocol. As the IT team reviewed the company's servers, L&W canvassed over 1,000 employees worldwide to hunt for potential material responsive to the Order. *See* ECF No. 154-2 at 5. It sent around a questionnaire in which the company identified the litigation and asked for employees' help in identifying documents or materials potentially subject to the Preliminary Injunction. *See* ECF Nos. 155-2 at 4; Declaration of Peter Swanson in Support of Pls' Mot. to Enforce ("Swanson Decl."), Ex. B at 1–4. The company also convened town hall meetings to inform employees about the Order and enlist their help in assuring compliance. *See* Swanson Decl., Ex. A at 1–2.

Using this information, L&W conducted additional searches of relevant employees' devices using search tools called Tanium and Jamf, on top of the scripts it ran on servers across the enterprise. *See* Vaughn Decl., at 3. The information L&W collected from its employees allowed it to home in on areas most likely to contain the relevant information and fill potential gaps in its broad-based server searches.

L&W accompanied these searches with separate investigations of individuals likely to have more specific knowledge about where to find relevant information. For example, L&W devoted

FILED UNDER SEAL

considerable attention to documents from Star Studio, the group at L&W that developed Dragon Train. L&W segregated all Star Studio devices and provided them to a digital forensics firm in Australia called Law in Order for forensic imaging. *See id.* at 3. Then, a team manually reviewed all documents from Star Studio custodians that had been marked relevant in this litigation, regardless of whether they were identified by search terms. L&W also interviewed employees to exclude false positives from its searches and include file locations that might have relevant documents. *See id.* Team managers and relevant business team members helped identify material potentially responsive to the Order. And L&W convened dozens of meetings to discuss and locate material that could have fallen through the cracks.

In total, these searches and accompanying investigations collected in excess of 35 and 40 *terabytes* of data.[4] *See id.* L&W's broad search terms allowed it to identify relevant locations on its servers where Plaintiffs' alleged trade secrets might be stored. Then L&W supplemented these searches with interviews, a company-wide campaign to promote awareness and compliance, and manual review of documents from the most relevant servers.

### C.    L&W Submitted Detailed Accountings to Aristocrat

To inform Aristocrat and the Court of its injunction compliance efforts, L&W submitted detailed accountings "describing with specificity every document identified in its search," and "every instance in which L&W has disclosed Plaintiffs' Trade secrets." ECF No. 125 at 20–21.

L&W erred on the side of inclusion in its accountings. As part of its October 23 Certification, L&W submitted a spreadsheet identifying every document it had identified in its search and remediated. Because its searches were conservatively designed to cover not just the

---

[4] To put into perspective, a single terabyte can store about 6.5 million document pages, or 1,300 filing cabinets of paper. *See* Dropbox, "How Much is 1 TB of Storage?" last accessed Dec. 12, 2024, at https://www.dropbox.com/features/cloud-storage/how-much-is-1tb.

FILED UNDER SEAL

alleged trade secrets but any document related to Dragon Train, L&W's accountings ultimately identified hundreds of thousands of documents. *See* LNW_033210–LNW_033273.

Even after the October 23 accounting, L&W had identified so many documents that, at first, Aristocrat sought to clarify that L&W actually segregated all of these files. *See* Swanson Decl., Ex. L at 1–2. L&W confirmed it had and explained its decision to err on the side of inclusion. *See* Swanson Decl., Ex. K at 2. After Aristocrat objected to the inclusion of some publicly-available files, such as Dragon Train game rules, in the accounting, L&W promptly addressed the issue in its November 6 accounting by removing some entries. *See* Swanson Decl., Ex. F at 2.

L&W also provided a complete accounting of disclosures of Plaintiffs' alleged trade secrets. L&W separately accounted for all external disclosures it had discovered, as well as certain internal disclosures that had emerged in its review. But because L&W's thorough accounting of its search for Plaintiffs' alleged trade secrets would capture other internal employees' access and dissemination of those secrets within the company, it complied with the requirement to produce an accounting of "disclosures" by directing Plaintiffs to the "search" accounting, which contained all of the relevant information. *See id.* at 2.

## III. Discovery Is Ongoing, and L&W Continues to Comply with the Injunction in Good Faith.

Discovery in this case is ongoing—especially document review—and the parties continue to learn of additional, relevant facts that relate to the alleged trade secrets. As a result, there are limitations inherent to complying with a preliminary injunction while the underlying case continues to evolve. L&W designed its compliance protocol around facts present at the time of the Preliminary Injunction. Nevertheless, because L&W takes its compliance with the injunction seriously—as shown by the substantial resources, employee time, and enterprise costs expended— L&W is continuing to supplement and modify its protocols as new facts emerge.

**FILED UNDER SEAL**

1    L&W has already taken steps on its own to update its injunction compliance steps as new

2    facts emerged. REDACTED

3    ████████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████

15   ██████████████████

16   REDACTED █████████████████████████████████████████████

17   ████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████

23   ███████████████████████████ L&W's efforts are ongoing, and it will update

24   Aristocrat if it discovers additional information.

## ARGUMENT

26   Aristocrat does not explicitly style its motion as one for civil contempt, but that is the

27   framework through which courts typically enforce orders like the preliminary injunction here. *See*

*California Dep't of Soc. Servs. v. Leavitt*, 523 F.3d 1025, 1033 (9th Cir. 2008) ("[C]ourts have inherent power to enforce compliance with their lawful orders through civil contempt.") (quoting *Shillitani v. United States*, 384 U.S. 364, 370 (1966)); *see also Desirous Parties Unlimited Inc. v. Right Connection Inc.*, 2022 WL 17417857, at *2 (D. Nev. Dec. 5, 2022) (Navarro, *D.J.*), *aff'd*, 2023 WL 4285504 (9th Cir. June 30, 2023) (evaluating a motion to enforce a preliminary injunction using the legal standards for civil contempt).

Civil contempt "consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). Aristocrat must prove that L&W violated the Court's Order by clear and convincing evidence—meaning evidence sufficient to produce "an abiding conviction that the truth of its factual contentions are highly probable." *Desirous Parties Unlimited*, 2022 WL 17417857, at *2 (quoting *Sophanthavong v. Palmateer*, 378 F.3d 859, 866–67 (9th Cir. 2004) (cleaned up)).

Substantial compliance is a defense to civil contempt. *See Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 466 (9th Cir. 1989). Although contempt "need not be willful" and there is no good faith excuse for non-compliance, a party "should not be held in contempt if his action 'appears to be based on a good faith and reasonable interpretation of the court's order.'" *In re Dual-Deck Video*, 10 F.3d at 695 (citations omitted). Furthermore, as this Court has recognized in other cases, civil contempt is inappropriate "where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct." *Desirous Parties Unlimited*, 2022 WL 17417857, at *2 (quoting *Taggart v. Lorenzen*, 587 U.S. 554, 561 (2019).

Aristocrat is not entitled to relief for two reasons.  First, L&W has substantially, if not fully, complied with the Preliminary Injunction by removing Dragon Train units, conducting searches for Plaintiffs' trade secrets, and fully accounting for its review to Aristocrat.  Second, even if the Court

FILED UNDER SEAL

identifies deficiencies with L&W's compliance on the margins, it should still deny the motion because L&W is actively updating its injunction compliance protocols as new facts emerge throughout discovery. There is no reason to coerce compliance with an injunction with which L&W is already complying.

## I.    L&W Has Complied With the Preliminary Injunction.

L&W has complied with the injunction, and Aristocrat's arguments to the contrary lack merit. L&W developed and implemented reasonable search protocols across an entire global company to ensure its compliance with each part of the Order. L&W devised document search and collection methods to identify and segregate files relating to Dragon Train, Dragon Link, and Lightning Link. And it complied with the Preliminary Injunction's order to account for all documents containing Plaintiffs' trade secrets and disclosures of those trade secrets.

### A.    L&W's Search Protocols Were Sufficient and Extended Beyond Dragon Train

Aristocrat's contention that L&W insufficiently searched for non-Dragon Train documents containing Plaintiffs' trade secrets is wrong for two reasons. First, L&W conducted an enterprise-wide search of files using three terms specific to Aristocrat and framed around the Preliminary Injunction.  And second, contrary to Aristocrat's argument, keyword searches were the start, not the extent, of a broad investigation for Plaintiffs' alleged trade secrets.

#### 1.    L&W Searched Its Servers for Plaintiffs' Alleged Trade Secrets

To identify and segregate files containing Plaintiffs' alleged trade secrets, L&W not only searched for all Dragon Train files, but it also searched for non-Dragon Train documents relating to Aristocrat's Dragon Link and Lightning Link games, as the Preliminary Injunction required. L&W deployed three Aristocrat-focused search terms—"Dragon Link," Lightning Link," and "Golden Century"—as parts of its search across 25 servers and 47 files repositories in ten countries. *See* ECF Nos. 154-2 at 4; 155-2 at 3.

FILED UNDER SEAL

L&W chose to use these Aristocrat search terms because the Preliminary Injunction identified Dragon Link and Lightning Link as the sources of Plaintiffs' trade secrets that L&W allegedly misappropriated. *See* ECF No. 125 at 1 ("[T]his case arises out of actions allegedly taken by L&W to copy the underlying mathematical formulas of Aristocrat's Dragon Link game in L&W's newer Dragon Train game."). As discussed above, L&W could not conduct content-based searches of all its files because it would be technologically and practically impossible unless L&W indexed the company's IT infrastructure.

But contrary to Aristocrat's portrayal of these searches, they were not limited to "explicit" mentions of the games. Mot. at 9. True, a file, folder, or drive would have to contain one of these terms at some point in the file pathway for the search to identify it. But L&W did not stop there. Once a search hit on a term, L&W identified and segregated not only the hit, but also other files related to it. For example, if the search picked up a file with the name "Dragon Link," L&W accounted for and remediated that file. And if the hit was on a folder name, the search captured the entire folder, all subfolders, and other affiliated documents within the same location, even if they did not contain the search terms. *See* Vaughn Decl., at 2–3. So, Aristocrat's argument that L&W's searches were limited to explicit mentions of Dragon Link is wrong from the start.

For the same reason, Aristocrat's argument that these search terms were insufficient is unavailing. Aristocrat claims that L&W's use of only one title of the Aristocrat games—"Golden Century"—was inadequate because Dragon Link and Lightning Link encompass many other titles. Mot. at 10. As an initial matter, L&W focused on Golden Century because Aristocrat's evidence at the preliminary injunction stage purported to show that Emma Charles used math from that title, so there is no basis for Aristocrat to argue that L&W cherrypicked this title over others. *See, e.g.*, ECF No. 52 (Plaintiffs' Motion for Preliminary Injunction) at 7–8.

**FILED UNDER SEAL**

But Aristocrat's argument is doubly wrong because Aristocrat tries to point to documents in L&W's *own accountings* to argue that L&W's search terms were deficient. Mot. at 10. Specifically, Aristocrat argues the accounting shows documents with other titles, such as Genghis Khan and Peacock Princess. Aristocrat overlooks the entire reason these documents appeared in the accounting: L&W's searches identified them using the same keywords Aristocrat claims were insufficient. As a result, L&W did not need to search for additional Dragon Link titles, because the existing results reveal the terms L&W used were sufficient to capture information on other titles.

In any event, Aristocrat's complaints about L&W's usage of search terms for purposes of injunction compliance leaves out a key fact: At no time did Aristocrat ever propose additional search terms for injunction compliance, even though the parties have been meeting and conferring on discovery search terms for months. It did not suggest additional terms after the October 23 accounting, after the November 6 accounting, or after L&W emphasized Aristocrat's failure to suggest search terms during later discussions. See Swanson Decl., Ex. F at 1 (L&W Email: "At no time since the issuance of the injunction order . . . has Aristocrat ever proposed any additional terms."). In other words, despite continually claiming that "L&W searched wrong," at no point did Aristocrat suggest specifically how L&W could have searched better. Perhaps this was because of the broad nature of the alleged trade secrets proposed by Aristocrat and identified in the Order– Aristocrat did not want L&W to focus down on specific math in complying with the Preliminary Injunction, for fear this would later box in Aristocrat's misappropriation arguments.

Aristocrat's Motion now tries to exploit its own strategic choice. Aristocrat refused to define its trade secrets with mathematical precision for purposes of injunction compliance, yet faults L&W for not doing that work on behalf of Aristocrat. But Aristocrat can't have it both ways. To comply with the injunction, L&W followed a broad-form approach of segregating all relevant Dragon Train files, supplemented with specific searches for Aristocrat game-related content. If Aristocrat had a

FILED UNDER SEAL

better search approach, it should have proposed one in the multiple meet and confers that preceded this Motion. The parties then could have met and conferred and attempted to reach a solution, rather than engage in this unnecessary motions practice.

## 2.    L&W Supplemented Its Search with Targeted Investigations.

Aristocrat's complaint that L&W's keyword searches were insufficient also ignores the multiple other steps L&W took to identify Plaintiffs' alleged trade secrets. Not only did L&W ask employees firm-wide about where to identify potential Aristocrat trade secrets, it also specifically targeted individuals and groups at L&W where information on those trade secrets were most likely to be found. Using the information it gathered from these sources, L&W then took steps to find other sources of Plaintiffs' alleged trade secrets that its keyword searches may not have identified.

To cast as wide a net as possible, L&W implemented several measures designed to canvass as many relevant people as possible across the company. It conducted town hall meetings with its employees to inform them about the litigation and the requirements of the Preliminary Injunction, and to enlist their help in identifying potentially responsive files. *See* Swanson Decl., Ex. A at 1–2. L&W also sent a questionnaire to over 1,000 employees to identify other potential locations of Plaintiffs' alleged trade secrets. *See* ECF Nos. 155-2 at 4; Swanson Decl., Ex. B at 1–4. The questionnaire asked whether employees had any exposure to Dragon Train math files and, if so, where those documents could be located. *See* Swanson Decl., Ex. B at 1–4. L&W pursued those leads to identify other locations where relevant information might be stored.[5]

Aristocrat balks at L&W's questionnaire because it was focused primarily on Dragon Train, not Aristocrat's trade secrets. But asking employees about Dragon Train is a logical first step in identifying the locations of potentially relevant *non*-Dragon Train documents that were used in its

---

[5] In any event, for employees who answered "yes" to earlier questions—suggesting they were likely to have relevant information— L&W's questionnaire included additional questions requesting information specific to Emma Charles and Aristocrat's Dragon Link and Lightning Link games. *See* Swanson Decl., Ex. B at 4.

development. The district court held that Aristocrat was likely to succeed in showing that "L&W misappropriated Aristocrat's trade secrets *in its development of Dragon Train*." ECF No. 125 at 16 (emphasis added). As a result, L&W asked its employees whether they worked on Dragon Train so that it could identify locations where the math files L&W allegedly used in developing Dragon Train were located. Moreover, the alternative to asking employees about Dragon Train would have been asking them whether they knew where to find "Aristocrat's trade secrets" on company servers. That would have been a futile exercise because such a request—without providing the trade secrets themselves—would not communicate to employees what to look for. Presumably Aristocrat did not want L&W to send a communication to all its employees informing them of Aristocrat's purported mathematical secrets.

Aristocrat also overlooks the range of tailored investigations L&W undertook to identify Plaintiffs' trade secrets. For example, L&W's efforts broadly considered Star Studio, the group that developed Dragon Train and that was led by Emma Charles, the former Aristocrat employee who allegedly stole the trade secrets at issue. Vaughn Decl., at 3. L&W retained a vendor in Australia to forensically image all Star Studio devices, collected all Star Studio custodian's files, and then had counsel *manually* review all relevant files for both injunction compliance and discovery in general. *See id.* at 3.

L&W conducted these searches regardless of whether files were identified by search terms, and it gathered information from relevant employees about where on the servers other instances of Plaintiffs' trade secrets might exist. *See id.* Team managers, business team members, and other employees provided L&W and its injunction compliance with leads, and L&W ran them down.

As a result, there is no basis for Aristocrat to claim that L&W focused its search on Dragon Train documents to the exclusion of other files that could contain Plaintiffs' trade secrets. L&W not only searched files associated with Aristocrat's Dragon Link and Lightning Link games, but it

**FILED UNDER SEAL**

1  also diligently supplemented these searches with far-reaching investigations across the company,

2  as well as manual review of the most relevant repositories, to identify documents not picked up by

3  these searches.

4      **B.      L&W Provided Detailed Accountings As Required by the Order**

5      Aristocrat's contention that L&W's accounting of disclosures was insufficient is similarly

6  contradicted by the facts. L&W provided an accounting showing all of L&W's disclosures of

7  Plaintiffs' trade secrets outside the company. The fact that the list is limited reflects that L&W does

8  not routinely share confidential math models outside of the company, not that L&W provided a

9  poor accounting. L&W also avoided duplicating effort—to save both L&W and Aristocrat time—

10  by omitting internal instances of sharing or viewing Plaintiffs' alleged trade secrets from the

11  disclosure accounting, because those entries were already provided in the separate accounting

12  showing where L&W found Plaintiffs' trade secrets in its files. Furthermore, Aristocrat's

13  incredulity at the lack of verbal disclosures is misplaced. L&W avoids discussing game math with

14  others as a general matter, plus the alleged trade secrets at issue here are, by nature, difficult to

15  communicate verbally.

16      According to Aristocrat, L&W's limited identification of disclosures in its accounting must

17  mean that L&W has failed to adequately search and identify these disclosures. But as L&W has

18  previously explained to Aristocrat, L&W's accountings of disclosures represent the extent of

19  disclosures the company has identified. *See* Swanson Decl., Ex. K at 3. To the extent that Aristocrat

20  complains that L&W did not separately include all instances of internal communication regarding

21  Plaintiffs' trade secrets on its disclosure accounting, that argument also misses the mark. All of

22  these instances are already identified in L&W's detailed accounting regarding its search efforts. As

23  a result, it would have been duplicative to separately account for them in the accounting of

24  disclosures. L&W has told Aristocrat that its accountings still collectively identify these documents,

FILED UNDER SEAL

but because they do not constitute disclosures outside the company, they are not all separately identified in its accounting of disclosures. *See* Swanson Decl., Ex. F at 3. Moreover, communications between L&W employees would not constitute disclosures under trade secret law because the information is not being disclosed to third parties. *See, e.g.*, *MedioStream, Inc. v. Microsoft Corp.*, 869 F. Supp. 2d 1095, 1113 (N.D. Cal. 2012) (noting that the California Uniform Trade Secrets Act requires showing that "the defendant either used the trade secret or disclosed it *to a third party*.") (emphasis added).

Next, Aristocrat complains about the lack of verbal disclosures in L&W's accounting. To the best of L&W's knowledge, there have been *no* verbal disclosures of Aristocrat's trade secrets. Aristocrat is unwilling to accept this answer. But consider the nature of Plaintiffs' alleged trade secrets. The values in a weight table, distribution of prizes, and arrangement of statistical spreadsheets are not the sorts of trade secrets that can be easily communicated verbally. The fact that L&W has not identified any verbal disclosures is consistent with the fact there were none. And if L&W ever identifies a verbal disclosure, it will supplement its accounting, REDACTED

Finally, Aristocrat unfairly claims that this Court cannot credit any representations by L&W that it has furnished all relevant disclosures because it previously represented it had not identified documents that later came to light. Aristocrat is right that L&W argued earlier in the case that it had not identified any Aristocrat files in its possession or control. But Aristocrat is wrong that L&W's representations hamper its credibility. L&W conducted a detailed investigation and made representations based on facts that it believed to be true. Upon learning that some of its employees had misrepresented these facts, L&W took steps to correct them. *See* ECF No. 169 (Notice of Withdrawal of Declarations of Emma Charles and William Soo). Accordingly, there is no basis to suggest that L&W's representations cannot be credited.

FILED UNDER SEAL

**II.    Even if the Court Finds L&W Did Not Guarantee It Found Every Last Possible Document, Discovery Is Ongoing and Sufficient to Address Aristocrat's Concerns.**

This Court should deny Aristocrat's motion because, even if a few documents fell through the cracks, there is no basis to coerce L&W into compliance because it is already working to comply. As described above, REDACTED

As a result, L&W's own efforts obviate this Court's intervention.

The fact that L&W discovered these files in its discovery document review, but not in its preliminary injunction compliance, is a result of the different nature of these searches. Discovery is ongoing in this complex case, and L&W continues to review documents that may be responsive to Aristocrat's requests. Discovery is broader than injunction compliance by nature. Here, the Preliminary Injunction focused on Plaintiffs' alleged trade secrets, defined in relation to Dragon Link and Lightning Link. Working with the tools available to them—and facing a tight deadline—Plaintiffs worked with an army of IT specialists, internal and external to the company, to capture all documents reflected in the order.

Discovery, on the other hand, is subject to different parameters and search capabilities. As discussed above, L&W is unable to conduct keyword searches of the contents of all of its files on an enterprise level because it does not have the technological capabilities to run these searches. However, L&W is able to—and has been—applying to individual custodial locations complex keyword search strings identified by Aristocrat as part of the discovery process. REDACTED

That L&W found this document through a separate process and

FILED UNDER SEAL

1   brought it to L&W's attention is a testament to L&W's commitment to injunction compliance and

2   the discovery process's usefulness at identifying documents that may fall through the cracks of a

3   process that has already captured in excess of 35 to 40 terabytes of files. *See* Vaughn Decl., at 3.

4       Because L&W is already taking steps to supplement its injunction compliance as new facts

5   emerge, Aristocrat does not need an order from this Court to "coerce" it into doing so. *Shell*

6   *Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 629 (9th Cir. 2016) (quoting *United States v.*

7   *United Mine Workers of Am.*, 330 U.S. 258, 303–04 (1947)); *see id.* (noting civil contempt's aim

8   on "coerc[ing] the defendant into compliance with the court's order"). In any event, discovery

9   provides Aristocrat a menu of tools to ensure compliance itself. It may serve L&W with

10  interrogatories or requests for admissions. Or it may use depositions to gather additional

11  information from L&W. *See Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079, 1098 (E.D.

12  Cal. 2012) (declining to appoint a special master to monitor injunction compliance because "[t]he

13  discovery process in civil litigation is quite often a sufficient way to monitor non-compliance").

14  Aristocrat "has access to substantial discovery tools that will allow Plaintiff[s] to assess

15  Defendants' compliance." *Exel N. Am., Inc. v. Integrated Dispense Sols. LLC*, 2015 WL 163990,

16  at *2 (E.D. Mich. Jan. 13, 2015). If Aristocrat identifies specific areas of deficiency in L&W's

17  injunction compliance, L&W will adjust its protocols as necessary. L&W's willingness to do so is

18  clear from the fact L&W has already done so based on facts it discovered itself.

19      As a result, there is no basis to grant Aristocrat's motion. L&W has not only already

20  complied with the Preliminary Injunction, but it continues to comply as new facts emerge through

21  its own diligence. At the very least, Defendants are in substantial compliance with this Court's

22  order and are taking steps to cure any outstanding issues. For the same reasons, Aristocrat is not

23  entitled to fees and costs because L&W is not in contempt.

FILED UNDER SEAL

## CONCLUSION

L&W respectfully requests that the Court deny Aristocrat's motion to enforce the preliminary injunction and deny Aristocrat's request for fees and costs incurred in connection with enforcing the injunction.

Dated: December 12, 2024

By: __/s/ Philip R. Erwin__
CAMPBELL & WILLIAMS
PHILIP R. ERWIN, ESQ.
710 South Seventh Street
Las Vegas, Nevada 89101

SUSMAN GODFREY L.L.P
NEAL MANNE (*pro hac vice*)
JOESEPH GRINSTEIN (*pro hac vice*)
ROCCO MAGNI (*pro hac vice*)
1000 Louisiana, Suite 5100
Houston, Texas 77002

SUSMAN GODFREY L.L.P
ERIK WILSON (*pro hac vice*)
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067

SUSMAN GODFREY L.L.P
Andrew Nassar (*pro hac vice*)
One Manhattan West, 50th Fl.
New York, NY 10001

*Attorneys for Defendants Light & Wonder,
Inc., L&W Gaming, Inc., and SciPlay
Corporation.*

- 22 -

FILED UNDER SEAL

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of December, 2024, I caused a true and correct copy of the foregoing **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE PRELIMINARY INJUNCTION** to be served via the United States District Court CM/ECF system on all parties requiring notice:

NICHOLAS J. SANTORO
(Nevada Bar No. 532)
JASON D. SMITH
(Nevada Bar No. 9691)
TYLER B. THOMAS
(Nevada Bar No. 16637)
SPENCER FANE LLP
300 South 4th Street, Suite 1600
Las Vegas, Nevada 89101
Tel.: (702) 791-0308
Email: nsantoro@spencerfane.com
jsmith@spencerfane.com
tbthomas@spencerfane.com

PETER SWANSON
(pro hac vice)
GARY RUBMAN
(pro hac vice)
SIMEON BOTWINICK
(pro hac vice)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Tel.: (202) 662-6000
Email: pswanson@cov.com
grubman@cov.com sbotwinick@cov.com

ZIWEI SONG
(pro hac vice)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
Tel.: (415) 591-6000
Email: ksong@cov.com

*/s/ Philip R. Erwin*
An employee of Campbell & Williams

FILED UNDER SEAL

## INDEX OF EXHIBITS

| Exhibit No. | Document | Page Nos. |
|---|---|---|
| - | Declaration of James Vaughn in Support of Defendants' Opposition to Plaintiffs' Motion to Enforce Preliminary Injunction | 1 – 4 |
| - | Declaration of Andrew Nassar in Support of Defendants' Opposition to Plaintiffs' Motion to Enforce Preliminary Injunction | 5 – 6 |
| A | December 6, 2024 Email Between Plaintiffs' Counsel and Counsel for L&W | 7 – 9 |